## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## (SOUTHERN DIVISION)

| | | |
|---|---|---|
| ANN and MINNIS HENDRICKS, | * | |
| *as parents of, and next friends to,* | | |
| *Mariam Hendricks* | * | |
| | | |
| Plaintiffs | * | |
| | | |
| v. | * | Civil Case No. 8:18-cv-02397-AAQ |
| | | |
| WASHINGTON METROPOLITAN | * | |
| AREA TRANSIT AUTHORITY | | |
| | * | |
| Defendant | | |
| | * | |

## MEMORANDUM OPINION AND ORDER

This is a case arising out of a series of physical attacks committed against Plaintiffs Ann and Minnis Hendricks's daughter, Mariam, on a MetroAccess van operated by Defendant Washington Metropolitan Area Transit Authority ("WMATA"). Plaintiffs, as parents of and next friends to Mariam, allege state law claims for negligence.[1] Pending before the Court is WMATA's Motion to Dismiss Plaintiffs' Complaint. ECF No. 67. The Motion has been fully briefed, and the Court concludes that a hearing is not necessary under this Court's Local Rules. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons discussed below, WMATA's Motion will be denied.

## BACKGROUND

Defendant WMATA operates a transit service called "MetroAccess" to provide transportation to members of the public with disabilities. *See* ECF No. 1, at 2. Plaintiffs' daughter,

---

[1] The United States District Courts, along with the courts of Maryland, Virginia, and the District of Columbia, have original jurisdiction over "all actions brought by or against" WMATA. Md. Code Ann., Transp. § 10-204(81) (West 2023).

1

Mariam, who has a cognitive disability and is nonverbal, used the MetroAccess system to travel between her home in Germantown, Maryland, and the adult day program she attended at St. Coletta of Greater Washington ("St. Coletta") in Rockville, Maryland.  *Id.*  Plaintiffs allege that in or around August of 2015, Sean Connely, who also attended St. Coletta, was seated next to Mariam on a MetroAccess van and "forcibly and violently attacked her."  *Id.*  The same day, a road supervisor came to Plaintiffs' house to tell them about the incident.  See ECF No. 72-1, at 2.  After the road supervisor left, Ann allegedly called WMATA's customer service department to report the incident.  *See id.* at 3–4.  The customer service representative told Ann that they would forward her report for investigation and Ann would receive a call after the investigation had been conducted.  *Id.* at 3.  When Ann did not hear back after two weeks, she called the customer service department again and asked for the name of the person investigating her report; the customer service representative responded that they could not provide the name of the investigator but that someone would "get in touch" with Ann.  *Id.*  Another two weeks passed without word from WMATA.  *Id.* at 4.  Ann called the customer service department again and requested that her daughter and Mr. Connely not be placed on the same van.  *Id.* at 4.  The representative referred her to Ms. Pannelly, a MetroAccess supervisor "who handled this type of situation."  *Id.*; *see id.* at 6.  Ann then called Ms. Pannelly, who told Ann that she had spoken to her own supervisor, and they had decided to separate Mariam and Mr. Connely.  *Id.* at 4.

Nonetheless, on or around September 9, 2015, Mariam and Mr. Connely were placed in the same MetroAccess van traveling from St. Coletta.  ECF No. 1, at 3.  Plaintiffs allege that during this trip, Mr. Connely attacked Mariam for a second time, "repeatedly str[iking] [her] and pull[ing] her hair."  *Id.*  The driver called the WMATA Transit Police, who responded to the scene.  *See* ECF No. 73-2, at 7.  Mariam suffered "significant injuries" as a result of the attack, including "left

shoulder pain, back and neck pain, bruising, swelling at the base of her head, and headaches." ECF No. 1, at 4. "[I]mmediately" after learning of the attack, Ann allegedly called WMATA's customer service department to file a report; she then called Ms. Pannelly and left a message. ECF No. 72-1, at 7. After two or three days without a response from Ms. Pannelly, Ann called again and informed Ms. Pannelly of the second attack. *Id.* Ms. Pannelly stated that she was not aware that Mariam and Mr. Connely had been placed on the same van, and that she would follow up with the "scheduling supervisor," who had told her that Mariam and Mr. Connely had been separated, and call Ann back. *Id.* Ann alleges that Ms. Pannelly did not call her back. *Id.*

Plaintiffs allege that in or around September of 2016, Mariam was again placed on the same MetroAccess van as Mr. Connely. ECF No. 1, at 4. While in the van, Mr. Connely "violently and forcibly attacked Mariam" a third time, though Mariam "did not appear to be seriously injured as a result of [the] attack." *Id.* Upon learning of this attack, Ann filed a third incident report with WMATA's customer service department, and called the MetroAccess department. *Id.*; ECF No. 72-1, at 13. According to Plaintiffs, the MetroAccess representative "promised" that Mariam and Mr. Connely would not be placed on the same van again. ECF No. 72-1, at 13; *see also* ECF No. 1, at 4.

Finally, Plaintiffs allege that on November 15, 2017, Mariam and Mr. Connely were again placed on the same MetroAccess van, and Mr. Connely attacked Mariam for a fourth time. ECF No. 1, at 4. Specifically, Plaintiffs claim that Mr. Connely "violently and forcibly assaulted Mariam by grabbing her right cheek and scraping that cheek in such a way as to leave cut marks, which are believed to be permanent." *Id.* After Mariam got home and Plaintiffs learned of this fourth attack, they went "straight to the police station to report the incident." ECF No. 73-1, at 15. Plaintiffs did not press criminal charges against Mr. Connely but hoped the police report would

3

create a "paper trail" that would "force" WMATA to keep Mariam and Mr. Connely separated.

*Id.* at 15–16.  That same week, Plaintiffs sought a restraining order against Mr. Connely in the

District Court of Maryland for Montgomery County.  *Id.* at 17, 20.  Because the restraining order

would have resulted in Mr. Connely's expulsion from St. Coletta, Mr. Connely's father offered to

make separate transportation arrangements for Mr. Connely so that he would no longer be using

MetroAccess, and in return, Plaintiffs agreed to withdraw their petition for a restraining order.

ECF No. 72-1, at 16.  Since then, to Plaintiffs' knowledge, Mr. Connely has not used MetroAccess.

*Id.*

On August 6, 2018, Plaintiffs filed a Complaint in this Court against WMATA.  ECF No.

1.  Plaintiffs' Complaint states two causes of action: (1) direct negligence and vicarious liability

for the November 15, 2017, incident; and (2) direct negligence and vicarious liability for the

September 9, 2015, incident.[2]  *Id.* at 5, 7.  WMATA filed an Answer to the Complaint on

September 2, 2018.  ECF No. 8.  WMATA then filed a Motion for Summary Judgment on

September 20, 2019, claiming that because its decisions regarding the provision or denial of

MetroAccess services are discretionary, it was entitled to sovereign immunity on any challenge to

such decisions.  ECF No. 33-1, at 4–8.  Although WMATA noted that the first question to ask in

this determination is whether the case involves a quintessential governmental function, such as

law enforcement activity, WMATA did not make this argument.  *Id.* at 5.  Rather, WMATA

argued: "In making decisions concerning providing separate transportation for Plaintiff's daughter

or denying Sean Connolly [sic] MetroAccess services, WMATA must weigh economic concerns

and social and policy considerations in light of the requirement to provide services to disabled

---

[2] Plaintiffs' Complaint also lists injunctive relief as a third cause of action.  ECF No. 1, at 8.
However, injunctive relief is a remedy, "not a standalone cause of action."  *See, e.g.*, *Doe v.
Salisbury Univ.*, 107 F. Supp. 3d 481, 493 (D. Md. 2015).

patrons under the Americans with Disabilities Act (ADA)." *Id.* at 8.  As WMATA relied chiefly on this argument, the evidence it filed in support of its Motion was limited.  It consisted of an excerpt of Ann Hendricks's deposition and a one-page affidavit from a MetroAccess representative describing the service generally.  ECF Nos. 33-5, 33-6.  Plaintiffs filed a Response in Opposition on November 4, 2019, ECF No. 36, to which WMATA filed a Reply on November 18, 2019, ECF No. 37.  On January 30, 2020, Magistrate Judge Charles Day held a hearing and denied WMATA's Motion for Summary Judgment.  ECF No. 41; *see also* ECF No. 63, at 35.  In making his decision, Judge Day emphasized that WMATA repeatedly represented that Mariam and Mr. Connely would be separated, a fact which WMATA "ha[d] offered nothing to dispute."  ECF No. 63, at 32.

On February 13, 2020, WMATA filed a Motion for Reconsideration or, in the Alternative, to Amend this Court's Order Denying Summary Judgment to Include a Certification for Interlocutory Appeal Pursuant to 28 U.S.C.A. § 1292(b), reiterating its argument that WMATA is immune from suit on challenges to its decisions regarding the provision or denial of MetroAccess services, ECF No. 44, at 5, which the Court denied the same day for the reasons stated during its hearing on WMATA's Motion for Summary Judgment, ECF No. 46.  Each party then made several filings in advance of trial, including proposed verdicts, proposed jury instructions, proposed voir dire, and statements of fact.  ECF Nos. 49–57.  A three-day jury trial was initially scheduled to begin on March 24, 2020, ECF No. 43, at 1, but was ultimately postponed due to the coronavirus pandemic.

The case then sat dormant for more than two years before it was reassigned to the undersigned's chambers.  ECF No. 64.  In the interim, no party filed any motions or otherwise sought any relief.  The Court, in turn, scheduled a status conference for August 21, 2023.  ECF No. 68.  On August 20, 2023 — the evening before the status conference — WMATA filed a

5

Motion to Dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction, again arguing that it was entitled to immunity, but this time on the basis that the case involved "law enforcement activity."  ECF No. 67-1, at 1.  Plaintiffs filed a Response in Opposition to WMATA's Motion to Dismiss on November 3, 2023, ECF No. 72, and WMATA filed a Reply on November 26, 2023, ECF No. 73.

## LEGAL STANDARDS

### I.      Rule 12(b)(1)

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A court must dismiss an action if it determines that it lacks subject matter jurisdiction, Fed. R. Civ. P. 12(h)(3), and thus "[a] motion to dismiss under Rule 12(b)(1) is nonwaivable and may be brought at any time," *Cason v. Holder*, 815 F. Supp. 2d 918, 924 (D. Md. 2011) (quoting *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006)).  Since the "defense of sovereign immunity is a jurisdictional bar," a defendant's assertion of sovereign immunity is properly analyzed under Rule 12(b)(1).  *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 579 (D. Md. 2021) (citing *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018)).  When ruling on a motion to dismiss for lack of subject matter jurisdiction, a court "should 'regard the pleadings as mere evidence on the issue,' and 'may consider evidence outside the pleadings,'" *id.* at 578 (quoting *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)), and should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law," *id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).  Although the plaintiff generally bears the burden of proof on subject matter jurisdiction, "the burden of proof falls to an entity seeking

immunity as an arm of the state." *Id.* at 579 (quoting *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019)); *see also Zito v. N.C. Coastal Res. Comm'n*, 8 F.4th 281, 284 (4th Cir. 2021) ("[T]he defendant bears the burden of demonstrating that sovereign immunity applies.").

## II.     Sovereign Immunity

WMATA enjoys sovereign immunity pursuant to the interstate compact ("the Compact") through which it was created. *See, e.g.*, *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205–06 (4th Cir. 2002).  Specifically, the Compact — executed by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia, and subsequently approved by Congress, *see id.* at 206 — provides that while WMATA "shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws)," it "shall not be liable for any torts occurring in the performance of a governmental function," Md. Code Ann., Transp. § 10-204(80).

To determine whether WMATA is entitled to sovereign immunity for an alleged tort, courts conduct a two-part inquiry derived from analyses of the federal government's immunity under the Federal Tort Claims Act.  *See Smith*, 290 F.3d at 206–07.  Under this inquiry, courts first consider whether the alleged tort was committed through the exercise of a "quintessentially governmental" function, such as law enforcement, in which case WMATA is immune from suit.  *Doe v. Wash. Metro. Area Transit Auth.*, 453 F. Supp. 3d 354, 363 (D.D.C. 2020); *see also Burns v. Wash. Metro. Area Transit Auth.*, 488 F. Supp. 3d 210, 216 (D. Md. 2020) ("Law enforcement, generally, is viewed as a quintessential government function.").

7

If the conduct at issue is not quintessentially governmental, courts must then determine whether the alleged tort was committed through the exercise of a proprietary (or ministerial) function or a discretionary function. *See Doe*, 453 F. Supp. 3d at 363. An act is proprietary if it entails "enforcement or administration of a mandatory duty at the *operational level*, even if professional expert evaluation is required," or if "any statute, regulation, or policy specifically prescribes a course of conduct for an employee to follow" and does not allow for discretion. *Id.* (first quoting *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988); and then quoting *KiSKA Constr. Corp. v. Wash. Metro. Area Transit Auth.*, 321 F.3d 1151, 1159 (D.C. Cir. 2003)); *see also Smith*, 290 F.3d at 208 (explaining that a proprietary activity "connotes the execution of policy as distinct from its formulation" (quoting *Griggs v. Wash. Metro. Area Transit Auth.*, 232 F.3d 917, 921 (D.C. Cir. 2000))). WMATA is not entitled to sovereign immunity for torts committed through the exercise of a proprietary function. *See Smith*, 290 F.3d at 208. If an act "involves 'judgment, planning, or policy decisions,'" on the other hand, it is discretionary. *Doe*, 453 F. Supp. 3d at 363 (quoting *Beatty*, 860 F.2d at 1127). WMATA is immune from liability for torts arising out of its discretionary decisions only when those decisions are "inherently . . . grounded" in "social, economic, or political" policy considerations. *Smith*, 290 F.3d at 208 (first quoting *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993); and then quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)).

## ANALYSIS

### I.   Sovereign Immunity

WMATA moves to dismiss Plaintiffs' Complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. ECF No. 67, at 1. Specifically, WMATA claims that it is entitled to sovereign immunity because "[a]ny alleged failure to provide adequate security or to prevent criminal

activity" — the crux of Plaintiffs' claims — "is a challenge to WMATA's police function," which is a governmental function.  ECF No. 67-1, at 5.  Plaintiffs dispute this characterization, contending that "the challenged conduct or duty is scheduling Metro Access [sic] passengers," which is a ministerial function.  ECF No. 72, at 5.  Such scheduling decisions, Plaintiffs argue, do not "constitute law enforcement activities" simply by virtue of the fact that they could have protected Mariam from further harm.  *Id.* at 6.

WMATA argues that because "protection of customers' security is within the purview of law enforcement," ECF No. 67-1, at 8 (quoting *Burns*, 488 F. Supp. 3d at 216), Plaintiffs' claim that WMATA did not adequately protect Mariam from Mr. Connely "implicates a quintessential governmental function," *id.*  Neither WMATA's opening Memorandum nor its Reply addresses the second step of the sovereign immunity analysis.  In essence, WMATA asks this Court to adopt the broad proposition that any case involving the protection of customers is barred by sovereign immunity.  *Id.* ("[T]his case involves a claim that WMATA failed to adequately protect one of its patrons from a threat to her security.  Thus, the Plaintiffs' contention that WMATA did not prevent Mr. Connely from riding the same van as Mariam, *for her protection*, implicates a quintessential governmental function . . . ."); ECF No. 73, at 4 ("Characterizing WMATA's conduct as a simple 'scheduling error' doesn't change the fact that WMATA was exercising its law enforcement function.  It doesn't matter how WMATA is alleged to be negligent in failing to respond to previous criminal activity.").  The relevant caselaw does not support this sweeping position.

While protection of passengers does fall within the scope of the WMATA Transit Police's duties, *see* Md. Code Ann., Transp. § 10-204(76)(a), "WMATA is not automatically immune from any tort claim involving the protection of passengers from violence," *Harris v. Wash. Metro. Area Transit Auth.*, 490 F. Supp. 3d 295, 314 (D.D.C. 2020) (citing *Wash. Metro. Area Transit Auth. v.*

*O'Neill*, 633 A.2d 834, 839 (D.C. 1993)) (distinguishing policing, which is a quintessential governmental function, from, more broadly, the protection of the public — which is not always a governmental function).  Indeed, WMATA Transit Police officers are not the only WMATA employees tasked with protecting passengers.  The Compact grants WMATA "the power to adopt rules and regulations for the safe, convenient and orderly use of [its] transit facilities . . . , including . . . the safety and protection of the riding public,"[3] Md. Code Ann., Transp. § 10-204(76)(e), and courts have found that WMATA was not entitled to sovereign immunity for non–police officers' failure to comply with such rules and regulations, *see, e.g.*, *Whiteru v. Wash. Metro. Area Transit Auth.*, 258 F. Supp. 3d 175, 185–89 (D.D.C. 2017) (concluding that WMATA was not shielded by sovereign immunity for station manager's failure to follow internal policy regarding closing inspections, which existed to help protect customers from being locked in stations after closing); *Robinson v. Wash. Metro. Area Transit Auth.*, 858 F. Supp. 2d 33, 37–39 (D.D.C. 2012) (holding that plaintiff's claims regarding bus driver's failure to follow safety directives contained in WMATA's Standard Operating Procedures were not barred by sovereign immunity).  Thus, protection of passengers is not *only* a law enforcement function.  *Cf. Harris*, 490 F. Supp. 3d at 314 (finding that plaintiff's challenge regarding "WMATA's choice not to instruct its employees to implement greater security" at a particular station "relate[d] to policy choices" and thus constituted a discretionary act).  Accordingly, the Court must consider the specifics of why Mariam and Mr. Connely were not separated on September 9, 2015, and November 15, 2017, and who was responsible, to determine if sovereign immunity applies.  *See Robinson*, 858 F. Supp. 2d at 37

---

[3] As WMATA noted in its Reply in support of its Motion for Summary Judgment, WMATA has adopted policies for responding to violent or threatening behavior.  *See* ECF No. 37, at 2; *see also id.* at 5–8 ("Direct Threat Policy"); *id.* at 9–17 ("Abusive Behavior Management Process").

(explaining that WMATA may at once be immune for particular actions, but at the same time, not

be immune for other actions of a different type in the same case).

Presently, there are material disputes of fact that prevent the Court from conclusively

determining, at this stage of the case, whether the case involves a quintessential governmental

function. *See Beatty*, 860 F.2d at 1126 ("Since there are material questions of fact as to whether

the nuisance was caused in the performance of a governmental or proprietary function, we cannot

hold, as a matter of law, that WMATA is immune from suit under the WMATA Compact.").

Plaintiffs allege Ann requested that WMATA place Mariam and Mr. Connely on separate vans,

WMATA "pledged" on multiple occasions to do so, ECF No. 1, at 3, and WMATA attempted to

implement the decision through its scheduling department, ECF No. 36-2, at 23.   However,

because the scheduling department failed to implement this decision, the vehicle operator failed to

prevent Mariam and Mr. Connely from riding in the same van.   ECF No. 1, at 6; ECF No. 72, at 2

("Plaintiffs contend that their daughter Mariam was injured due to a WMATA scheduling error

that allowed [Mr.] Connely . . . to ride in [a MetroAccess van] with Mariam *after WMATA

promised her mother Ann Hendricks . . . that it would not do that*.").  These assertions are supported

by  evidence  adduced  during  discovery.   Ann  testified  that  during  a  call,  Ms.  Pannelly,  a

MetroAccess  supervisor,  committed  to  separating  Mariam  and  Mr.  Connely;  WMATA's

scheduling supervisor told Ms. Pannelly that they would separate Mariam and Mr. Connely; and

WMATA did, in fact, make sure they were not placed in the same van for a period of time.   ECF

No. 72-1, at 5–7; *see also id.* at 13–14 (stating that Ann would speak with St. Coletta's receptionist

as to whether Mariam and Mr. Connely were riding together, since "she's the one that sees the

people" and "record[s] the people coming, who ride with who [sic], . . . which MetroAccess bus

pick [sic] up X-Y-Z").  Further, when Ann informed Ms. Pannelly that Mariam and Mr. Connely

11

had been again placed in the same van, Ms. Pannelly stated that she would confer with WMATA's "scheduling supervisor." *Id.* at 7.

In response, WMATA claims that its "effort to separate [Mariam and Mr. Connely] was . . . part of a broader law enforcement effort involving WMATA, multiple police departments, and a Maryland state court." ECF No. 73, at 4. The evidence, when considered in combination with the allegations above, paints a less than clear picture. While WMATA Transit Police officers did, upon the van driver's call, respond to the September 9, 2015, incident,[4] the incident report filed the same day indicated that the case was closed — suggesting that WMATA police played no continued role in the matter. ECF No. 73-2, at 2, 7. WMATA's reliance on the Hendricks' request for a restraining order is likewise not conclusive. Although the Hendricks sought such an Order, the District Court for Montgomery County did not issue a restraining Order until after the final incident for which Plaintiffs seek relief — which, to Plaintiffs' knowledge, is the last time Mariam and Mr. Connely were placed on the same van — and therefore was not part of the "separation effort" at issue. *See* ECF No. 36-2, at 31–32; ECF No. 73-1, at 20. Finally, WMATA has not provided any information about or explanation for the alleged failures to keep Mariam and Mr. Connely separated in response to Plaintiffs' allegations. Accordingly, Plaintiffs' allegations and deposition testimony stand largely unchallenged. While WMATA previously argued that its decision with respect to the separation of Mariam and Mr. Connely was discretionary, it has not renewed that argument, much less provided any support that its actions or inactions were grounded

---

[4] During her deposition, Ann testified that the police responded to the August 2015 incident, but she was not aware of a police response to the September 9, 2015, incident. *See* ECF No. 36-2, at 13–14, 25. However, the WMATA Transit Police report attached to WMATA's Reply to Plaintiffs' Response in Opposition to its Motion to Dismiss indicates that the WMATA Transit Police responded to the September 9, 2015, incident, as well. *See* ECF No. 73-2, at 2.

12

in economic, social, or political policy considerations.  *See, e.g.*, *Falco v. Wash. Metro. Area Transit Auth.*, No. 18-2766, 2020 WL 473887, at *3 (D.D.C. Jan. 29, 2020) (rejecting WMATA's claim of sovereign immunity based on discretionary function where WMATA had not identified any "competing interest" or shown that "any actual decision . . . occurred"); *Whiteru*, 258 F. Supp. 3d at 185 ("[T]he exercise of discretion that warrants immunity still must be a 'decision . . . which we would expect inherently to be grounded in considerations of policy.'" (quoting *Smith*, 290 F.3d at 208)).  These disputed issues of fact preclude the Court from finding that, as a matter of law, sovereign immunity bars Plaintiffs' case.

Although WMATA argues that this case is "on all fours" with three recent cases in which courts held that WMATA was entitled to sovereign immunity, ECF No. 73, at 3, those cases are distinguishable, given the specific nature of the plaintiffs' allegations in those cases.  In *Doe v. Washington Metropolitan Area Transit Authority*, 453 F. Supp. 3d 354 (D.D.C. 2020), the plaintiff alleged that WMATA failed to take several specific actions of the type that typically would be undertaken by police, thus implicating WMATA's law enforcement function.[5]  *See id.* at 364 (citing the plaintiff's allegations that WMATA "negligently 'failed to take appropriate steps to either apprehend [the assailant] prior to [the plaintiff's] incident, prevent him from using the WMATA system[,]' [or] 'warn passengers of [the assailant's] potential presence and the danger to them'" (internal citation omitted) (quoting Complaint ¶ 12, *Doe*, 453 F. Supp. 3d 354 (No. 19-

---

[5] The plaintiff's opposition in *Doe*, in arguing that sovereign immunity did not apply, identified activities that by their nature would only be performed by police officials.  *See* Plaintiff's Opposition to Defendant WMATA's Motion to Dismiss at 8, *Doe*, 453 F. Supp. 3d 354 (No. 19-cv-1298), ECF No. 8, at 9 (arguing that "WMATA could have informed its station managers of [the assailant] and had them lookout for him and keep him out of the rail system[,] . . . canceled [the assailant's] Smart Trip card[,] or posted pictures of [the assailant] so that passengers could be on the lookout for him"); *Doe*, 453 F. Supp. 3d at 365 (indicating that the alleged inactions were "within the purview of law enforcement by nature").

cv-1298))).  Likewise, in *Burns v. Washington Metropolitan Area Transit Authority*, 488 F. Supp. 3d 210 (D. Md. 2020), the plaintiff's allegations were directly targeted at WMATA's failure to undertake particular police actions.  *See id.* at 213 (citing the plaintiff's allegation "that there was insufficient security present on his train and in the Metro Station to prevent or stop [his] attack, or to apprehend the perpetrators"); *id.* at 216 ("Plaintiff's three tort claims, for negligence, gross negligence, and intentional infliction of emotional distress, allege that WMATA did not adequately provide security services . . . .").  As a result, in both cases, the courts held that WMATA's response — or lack thereof — was within the purview of law enforcement, and thus the plaintiffs' claims were barred by sovereign immunity.  *See Doe*, 453 F. Supp. 3d at 365; *Burns*, 488 F. Supp. 3d at 217.  Finally, although *Williams v. Washington Metropolitan Area Transit Authority*, No. GLS-21-2373, 2023 WL 4421573 (D. Md. July 10, 2023), did not involve allegations of WMATA police inactivity, the plaintiff similarly alleged that WMATA was negligent because it failed to physically restrain another member of the public and intercede when an assault was occurring — activities that fall firmly within the responsibilities of police officials.  *See id.* at *2 ("The Bus Driver, however, took no action to restrain the Passenger."); Complaint ¶ 17, *Williams*, No. GLS-21-2373, ECF No. 6, at 5 ("Despite being on notice of the assault . . . , the bus driver did not rectify the situation by re-securing the chair of the assaulter . . . ."); *id.* ("At that time, with no one on the bus to intercede, the assaulter attacked [the plaintiff] again.").  In none of these cases, however, were there allegations and evidence that WMATA determined that two passengers should be separated and then failed to follow through on that commitment as a result of its administrative negligence.

Unlike the cases on which WMATA relies, shielding it from liability on Plaintiffs' claims in this case would not serve the purposes of sovereign immunity.  Courts in the Fourth Circuit have recognized that a primary intention underlying the Compact's grant of sovereign immunity to

14

WMATA for torts committed in the exercise of its governmental functions is to prevent the "handicap [of] efficient government operations" that would occur if the judiciary could "'second-guess[]' . . . legislative and administrative decisions grounded in social, economic, and political policy." *Sanders v. Wash. Metro. Area Transit Auth.*, 819 F.2d 1151, 1155 (D.C. Cir. 1987) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)); *cf. Alden v. Maine*, 527 U.S. 706, 752 (1999) (expressing, in the context of state sovereign immunity, concern about the judicial branch "assum[ing] a role not only foreign to its experience but beyond its competence"). Here, however, Plaintiffs do not challenge a decision to not separate Mariam and Mr. Connely after the first attack based on the agency's expertise and judgment; instead, Plaintiffs allege, supported by evidence in the record, that WMATA failed to follow through on the decision it had already made to keep Mariam and Mr. Connely separated as a result of its administrative negligence. Thus, allowing Plaintiffs' negligence claims to proceed does not create the same risk of judicial interference with WMATA's processes for responding to potentially criminal conduct, as was the case in *Burns*, *Doe*, and *Williams*, where the plaintiffs challenged activities that either were or would typically be performed by police officials.

In sum, to accept WMATA's argument in this case would have a profound result. It would require the Court to conclude that regardless of any evidence and allegations to the contrary, WMATA is immune, as a matter of law, if a case involves the protection of a passenger no matter the ultimate basis for WMATA's failure or the lack of evidence in support. The Court is not holding, as a matter of law, that immunity does not apply in this case. Rather, given the allegations and evidence here, and WMATA's failure to present any evidence otherwise explaining the circumstances that led to the alleged assaults, the Court cannot presently conclude that sovereign immunity applies. To the extent that WMATA presents evidence at trial establishing that the

causes of these placements were actions rooted in a law enforcement function, it may renew its request then.

## II.     Law of the Case

Although not determinative, it is relevant that WMATA previously asserted its entitlement to sovereign immunity in its Motion for Summary Judgment, which the Court denied.  *See* ECF No. 63, at 26, 35.  WMATA reiterated its argument for sovereign immunity in a Motion for Reconsideration, ECF No. 44, at 5, which the Court again denied, ECF No. 46.  After the case was transferred to the undersigned, the Court set a date for a status conference.  In a Joint Status Report in advance of the conference, the parties "request[ed] that the Court set a trial date convenient to the court and the parties."  ECF No. 66, at 1.  The evening before the status conference was set to occur, WMATA raised the argument for a third time in the present Motion.  ECF No. 67-1, at 1.

"The law-of-the-case doctrine recognizes that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  The doctrine "is a 'practice of courts,' 'not a limit to their power,'" *Westmoreland v. Prince George's County*, No. TDC-14-0821, 2016 WL 5720706, at *9 (D. Md. Sept. 30, 2016) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)), and it "poses no bar to the assessment of past holdings based on a different procedural posture" where the subsequent development of facts "expands the court's inquiry," *Graves*, 930 F.3d at 318.  Still, courts "should be loath" to revisit their prior decisions "in the absence of extraordinary circumstances," *Westmoreland*, 2016 WL 5720706, at *9 (quoting *Christianson*, 486 U.S. at 817), such as "(1) when a trial has resulted in substantially different evidence; (2) there has been a change in controlling legal authority that has made a contrary decision of law applicable to the issue; or

16

(3) the prior decision was clearly erroneous or would result in manifest injustice," *id.* (citing *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)).

Although this Court is not bound by Judge Day's denial of WMATA's Motion for Summary Judgment,[6] WMATA has provided insufficient reason for the Court to depart from that decision. First, WMATA's arguments in support of its Motion to Dismiss do not rely on any evidence that was not available when it submitted its Motion for Summary Judgment. *See Ogunsula v. Md. State Police*, No. ELH-20-2568, 2022 WL 3290713, at *12 (D. Md. Aug. 11, 2022) ("By its terms . . . this ground refers to evidence discovered *during* litigation, not simply to material that a party could have offered initially but chose not to present." (citing *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 326 (4th Cir. 2017))). Second, while the three cases WMATA primarily relies on were all decided after Judge Day's denial of WMATA's Motion for Summary Judgment, the Court, as discussed above, does not find those cases controlling here. Third, the Court does not find that Judge Day's decision was clearly erroneous or would result in manifest injustice. As courts in the Fourth Circuit have explained, a decision does not satisfy this ground "by being just maybe or probably wrong," but rather must be "dead wrong." *Ogunsula*, 2022 WL 3290713, at

---

[6] In addition to the law of the case doctrine being a practice of the courts rather than a limit on their power, courts in the Fourth Circuit have made conflicting statements as to whether the doctrine applies to interlocutory rulings. *Compare Smith v. Maryland*, No. RDB-17-3051, 2020 WL 128670, at *3 (D. Md. Jan. 10, 2020) ("[T]he law of the case doctrine does not apply to interlocutory rulings, such as a denial of summary judgment."), *and Chaplick v. Mao*, No. TDC-13-2070, 2016 WL 4516061, at *3 (D. Md. Aug. 25, 2016) ("The United States Court of Appeals for the Fourth Circuit has indicated that the law of the case doctrine does not apply to interlocutory rulings." (citing *Winchester Homes, Inc. v. Osmose Wood Preserving, Inc.*, 37 F.3d 1053, 1058 n.8 (4th Cir. 1994))), *with Canty v. Corcoran*, No. GLR-18-1404, 2022 WL 899278, at *6 (D. Md. Mar. 28, 2022) ("The Fourth Circuit has held that . . . the law of the case doctrine applies to interlocutory rulings . . . ." (citing *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017))), *and Chase v. Dep't of Pub. Safety & Corr. Servs.*, No. ELH-18-2182, 2020 WL 1914811, at *11 (D. Md. Apr. 20, 2020) ("[A]s the Fourth Circuit has explained, the law of the case doctrine applies to interlocutory rulings, notwithstanding the fact that such decisions are amenable to revision, pursuant to Fed. R. Civ. P. 54." (citing *Carlson*, 856 F.3d at 325)).

*12 (quoting *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 258 (4th Cir. 2018)). While WMATA, in its Motion for Summary Judgment, argued that it was entitled to sovereign immunity because its decisions with respect to the separation of Mariam and Mr. Connely were discretionary acts, *see* ECF No. 33-1, at 8, Judge Day concluded that WMATA's failure to keep Mariam and Mr. Connely separated was not the type of decision that "the discretionary function exception was designed to shield," as there was no evidence that it was "grounded on social, political[,] or economic policy," ECF No. 63, at 34. Again, as discussed above, WMATA still has not provided any evidence that it placed Mariam and Mr. Connely on the same van as a result of a decision grounded in social, economic, or political policy considerations. Therefore, the law of the case doctrine additionally weighs against departing from Judge Day's prior decision finding that WMATA is not entitled to sovereign immunity in this case.

## CONCLUSION

The Court does not hold that, as a matter of law, immunity does not apply to Plaintiffs' claims. To the extent that, at trial, WMATA produces sufficient evidence that Mariam's and Mr. Connely's placement on the van was not the result of a scheduling error, but rather: (1) the decision of WMATA police officials; or (2) other officials' failure to perform traditional police functions, sovereign immunity may nonetheless apply. However, given the nature of Plaintiffs' allegations, the evidence Plaintiffs have presented in support, the broad scope of WMATA's argument in its present Motion, and its present failure to put forth sufficient evidence to establish as a matter of law that a police function was involved, WMATA's Motion to Dismiss, ECF No. 67, is, hereby, denied.

So ordered.

Date:  January 29, 2024

_____/s/_____
Ajmel A. Quereshi
U.S. Magistrate Judge